UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ELIZABETH SANDERS and JUDE
BECKOWITZ,

        Plaintiffs,

                                    Case Number 09-14377
v.                                    Honorable David M. Lawson

ADRIENNE M. STANLEY, D.O., DR.
JOSELYN PAIGE (a/k/a DR. JOSLIN-PAGE),
BARBARA KOZLOFF, SERRA, JANE DOES 1-2,
LATONYA BOOKS, ELLA M. BULLY-
CUMMINGS, JOHN DOE 1-2, KEITH NORROD,
and GREGORY STUPCYNSKI,

        Defendants.
_____/

## OPINION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT BY DEFENDANTS STANLEY AND JOSLIN-PAGE

The plaintiffs in this case brought suit against defendants Adrienne Stanley and Judith Joslin-Page, both physicians at Botsford Hospital in Farmington Hills, Michigan for defamation, intentional infliction of emotional distress, invasion of privacy, and false imprisonment, alleging that the doctors falsely reported to the police that plaintiff Elizabeth Sanders had given birth and that she and co-plaintiff Jude Beckowitz had disposed of the fetus illegally. Other defendants are named in the action as well. Before the Court presently is a motion for summary judgment by defendants Stanley and Joslin-Page. They argue, among other things, that they are protected by common law immunity and the immunity provision in the Child Protection Act against civil liability for reporting the plaintiffs to the police. They also argue that the plaintiffs have not offered evidence to support the claim that Ms. Sanders was falsely imprisoned. After hearing argument from the parties in open

court on April 26, 2011, the Court agrees. Therefore, the Court will grant the motion for summary judgment and dismiss the case against these two defendants.

I.

According to plaintiffs' counsel, Elizabeth Sanders and Jude Beckowitz have led an alternative lifestyle and have lived "off the grid" for several years. In late June 2008, plaintiff Elizabeth Sanders suffered a miscarriage. She says that she did not know she was pregnant and passed a bloody mass one day in the bathroom. She did not seek immediate medical attention, but she continued to bleed. Mr. Beckowitz eventually convinced her to go to a hospital, and on July 1, 2008, he took Sanders to the emergency room at Botsford Hospital in Farmington Hills, Michigan.

Sanders told emergency room personnel of her vaginal bleeding over the past 24 hours. Doctors examined her and concluded eventually that Sanders's pregnancy had been over 28 weeks in development, that she possibly had given birth to a viable fetus, and that a live baby may be at risk somewhere needing help. The doctors notified the police. Soon thereafter, the media reported that Sanders and her partner, plaintiff Jude Beckowitz, had given birth and disposed of the baby in a dumpster. The plaintiffs were excoriated in the press, Beckowitz was arrested without a warrant, Sanders was kept in the hospital incognito, and when they both returned home their house was vandalized.

Plaintiffs' counsel acknowledges that the hospital physicians performed valuable service in their medical treatment of Elizabeth Sanders. The plaintiffs also contend that the doctors' speculation about the term of Sanders's pregnancy is not based on a proper level of competence, and their suggestion that she gave birth to a live baby, later disposed of, was exceedingly damaging to

her and her partner. As plaintiffs' counsel contended at oral argument, the doctors saved her life and ruined her reputation.

The record facts in this case tend to support those claims, although there is some dispute over details. When Sanders arrived in the emergency room, she was bleeding internally and exhibited symptoms of shock, including low blood pressure and tachycardia. Emergency room doctor Diane Paratore examined Sanders and indicated that her cervix, ovaries, and uterus appeared to be of "normal size." Br. in Resp. to Botsford Mot. Summ. J. at 2 & Ex. 3, Dr. Paratore's Report. Dr. J.P. Maganito, an obstetrical resident, noted some dilation in the cervix and concluded that the Sanders' uterus was "approximately 8-10 weeks in size," a guideline reference based on the size of the uterus during this period of a normal pregnancy. *Id.* at 2 & Ex. 4, Dr. Maganito's Initial Exam Notes; Ex. 5, Discharge Summary; Botsford Mot. Summ. J., Ex. 1, Dep. of Stanley, at 74. Efforts in the emergency room to alleviate Sanders' shock-related symptoms yielded little success.

The resident contacted Dr. Stanley around 4:00 a.m. Stanley was at the hospital when called, and she arrived at the emergency room promptly. She attempted to take a history from Sanders, but Sanders' responses to Stanley's questions were vague or non-existent. Stanley said that Sanders did tell her that she had a menstrual cycle approximately 30 days earlier, had been bleeding for over a day, and had passed some internal matter at home within the past 24 hours. At the time, Dr. Stanley suggested that the continued bleeding could have been caused by the uterus's inability to contract normally after Sanders' incomplete miscarriage. The plaintiff's expert, Dr. Jeffrey Wener, concluded that Sander's uterus's inability to contract normally would have prevented it from shrinking substantially after her miscarriage, and therefore Stanley's opinion on the gestational term, which she reached by extrapolating from the size of the uterus she saw, was erroneous.

Dr. Stanley performed a "dilation and curettage" (D&C) that morning at 5:00 a.m. After placing the plaintiff under anesthesia, Stanley examined the plaintiff and found that her cervix was dilated and positioned at the vaginal opening in a manner atypical of an early miscarriage, her peritoneum was bulging also in a manner atypical of an early miscarriage, her uterus was enlarged to the size of a uterus equivalent to a 14-to-16 week pregnancy, and the tissue in her uterus appeared placental in nature. Medical records indicate that at some point after completing the procedure and exams, Sanders' uterus had shrunk to a size equal to an 8-to-10 week pregnancy. Stanley testified at her deposition that a uterus typically shrinks to about 50% of its size immediately after birthing the fetus, and a 14-to-16-week uterus size at the time of the D&C was indicative of a pregnancy of approximately 28 to 32 weeks. She also testified that the age of viability generally is considered to be 24 weeks. The information she obtained during her exam and the subsequent procedure caused Stanley to suspect that Sanders had delivered a potentially viable fetus at home and had inaccurately recounted her most recent menstrual cycle. At approximately 6:00 a.m., Stanley attempted to update Beckowitz in person in the waiting room, but found that he had left; she called and left a message on his cell phone when he did not answer.

After completing the surgery around 7:00 a.m., Stanley called the doctor replacing her, defendant Dr. Judith Joslin-Page, and explained her concerns. After Joslin-Page examined Sanders in the recovery area at 7:30 a.m., she made the same findings as Stanley, and both doctors expressed concerns about inconsistencies with the plaintiff's reported history and the potential birth of a viable fetus. Joslin-Page contacted Beckowitz by phone after her examination and was able to reach him; she explained that Sanders was in critical condition and attempted to obtain more information about

her medical history. The plaintiffs contend that neither Stanley's statements nor Sanders' medical records indicate that the pregnancy went longer than 16 weeks or reached the point of viability.

At 7:40 a.m., following her examination of and discussion with Stanley, Joslin-Page made the decision to contact the police. However, she first consulted with a doctor in the emergency room and confirmed the proper protocol for doing so. Around 9:30 that morning, Officer Craig Dersa and Sergeant John Regorrah from the Farmington Hills Police Department interviewed Joslin-Page and Stanley at the hospital. Joslin-Page described her findings following the postoperative exam. Stanley explained what she found during the D&C and opined that the plaintiffs could not have provided an accurate preoperative medical history. Thereafter, the accounts diverge as to what was said next.

The Farmington Hills police report dated July 1, 2008 states that the doctors described the birth of a full-term infant. However, Stanley denied ever stating or hearing Joslin-Page say that Sanders had delivered a full term baby. In their deposition testimony describing their conversations with the police, the doctors gave different estimates of gestational periods of 20 to 24 weeks, "at least 24 weeks," and 28 to 32 weeks. Joslin-Page explained that the doctors had provided the officers with extensive background medical information and the officers may have become confused by the different definitions, but that she believed her bottom-line concern — that a live baby may need help — had been communicated.

A police report from later in the day on July 1 indicates that Officer Stacy Swanderski visited the hospital and learned that fetal matter would be sent for age testing, but Dr. Stanley denied any knowledge of this type of testing or the report.

Around July 2, officers from the Detroit Police Department interviewed Dr. Stanley and asked her to determine a more specific gestational age. Dr. Stanley informed the officers that "the baby was at least 24 weeks, was probably greater than 24 weeks . . . but short of . . . term." Mot. Summ. J., Ex. A, dep. of Stanley, at 58, 109. The officers also spoke with Dr. Joslin-Page and requested more detailed information about the size of the fetus to aid in their search.

Sanders suffered life-threatening complications from the July 1 surgery and remained unconscious until July 4, 2008. She initially was admitted to the hospital under the name Elizabeth Sanders, but during the time she was unconscious the medical records were changed to identify her as "Shannon Aldmen." Stanley noticed the name change on her July 2 rounds visit and was told by someone in the risk management department that he made the change to protect Sanders. Stanley denied any involvement in or knowledge of the procedure for changing a patient's name and did not mention the change to her patient.

Sanders says that shortly after she awoke on July 4, a Farmington Hills police officer visited her; Sanders expressed confusion about the officer's references to a baby and denied that a baby existed. Dr. Stanley examined Sanders on July 5, explained the events of the preceding days including her operative findings, and again asked Sanders to describe the mass she had passed at home. Sanders explained that the substance was about the size of her hand and that Beckowitz and she had "wrapped it up and put it in a bag and threw it in the dumpster." Mot. Summ. J., Ex. A, dep. of Stanley, at 36. Sanders apparently told other medical personnel that she had flushed the discharge down the toilet. During her July 6 examination of Sanders, Stanley "explained to her that we still need to watch her because it wasn't time for her to be discharged." *Id.*, Ex. A, dep. of Stanley, at 38. Sanders was not released from the hospital until July 8. Throughout Sanders's hospital stay,

in response to questions from the media and other callers, Botsford Hospital denied that Sanders was an admitted patient.

Sanders alleges that hospital personnel refused to allow her friends or family, including Beckowitz, to visit her while she was hospitalized. Beckowitz initially was turned away but was able to visit Sanders briefly on July 5, with security guards present. He updated Sanders on the events that had occurred while she was unconscious, including that he had been prevented from visiting her. Sanders acknowledged that her friend and employer, Pat Hopkinson, had visited her in the intensive care unit.

As a result of the reports to police made by Drs. Stanley and Joslin-Page, during Sanders's hospital stay, police officers interviewed Beckowitz, searched the plaintiffs' home twice (without a search warrant), searched the homes of their friends and family members, reported the alleged birth and fetus disposal to the media, and arrested Beckowitz without a warrant, although he was released later without charges.

A few days after Sanders was released from the hospital, the plaintiffs were subjected to several threatening events at their home, including shots fired at their house, threats from strangers in the middle of the night, and broken windows at their home and vehicle. They allege that the police were slow to respond and failed to investigate. The plaintiffs allege that they have suffered a variety of emotional injuries related to these incidents and attributed to the actions of the defendants, including humiliation, embarrassment, emotional distress, sleeplessness, anxiety, loss of income, and damage to their reputations.

On November 6, 2010, the plaintiffs filed a complaint in this Court, which was later amended. After a motion to dismiss certain counts filed by defendants Stanley and Joslin-Page and

a stipulation to dismiss other counts, the following counts remain against these defendants in the third amended complaint: defamation (count I), intentional infliction of emotional distress (count II), invasion of privacy (count III), invasion of privacy – false light (count V), and false imprisonment as to plaintiff Elizabeth Sanders only (count VI). A variety of other claims remain against Detroit police officials, but they are not relevant to the motion presently before the Court.

II.

The plaintiffs' claims against the doctor defendants fall into two categories: those that are based on the communications to police officers (defamation, intentional infliction of emotional distress, invasion of privacy, and invasion of privacy – false light); and those based on Sanders's confinement in the hospital (false imprisonment). The defendants argue that the former must fail because the communication was privileged under the rule that statements made to the police regarding criminal activity are protected, and because Michigan's Child Protection Act, Mich. Comp. Laws § 722.625, grants immunity to individuals reporting suspected child abuse and imposes a presumption of good faith on activities in compliance with the statute. As to the latter claim, they argue that the undisputed facts do not support a cause of action for false imprisonment because there is no proof that Stanley or Joslin-Page were responsible for assigning Sanders an alias or that the doctors prevented her from leaving the hospital, and both doctors testified without contradiction that they had no involvement with either activity.

The plaintiffs dispute the defendants' argument that an expansive privilege covers all communications to law enforcement personnel. They insist that there is a distinction between reporting false facts to instigate a police investigation (which is actionable) and providing honest, but ultimately incorrect, information to police who are investigating a crime (which is not). The

plaintiffs contend that the divergence of medical opinions in the record supports an inference that Stanley and Joslin-Page knew the information about the possibility of a viable birth was false, and the question of their immunity must be submitted to a jury. The plaintiffs also argue that the defendant doctors did not have a moral or legal duty to report the plaintiffs in this case. They contend that a fact issue prevents the Court from determining as a matter of law that the defendants had the "reasonable cause" necessary to trigger their reporting obligation under the Child Protection Act.

On the false imprisonment claim, the plaintiffs do not address the argument that the two doctors had no hand in concealing plaintiff Sanders's identity or interfering with visitation. Instead, they point to evidence that Beckowitz was prevented from visiting Sanders or forced to visit her with a security guard supervising, and that Sanders was aware of her confinement and alias from July 4 through her discharge. They counter the defendants' argument that Sanders could have left the hospital at any time by observing that such termination of her treatment would have been against medical advice.

Summary judgment is appropriate where "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A trial is required only when "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Where the facts are mostly settled, and the question before the court is purely a legal one, the summary judgment procedure is well suited for resolution of the case. *See Cincom Sys., Inc. v. Novelis Corp.*, 581 F.3d 431, 435 (6th Cir. 2009).

The party bringing the summary judgment motion has the initial burden of informing the court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. Fed. R. Civ. P. 56(c)(1)(A)&(B); *Mt. Lebanon Pers. Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002). If the party opposing the motion contends that facts are in dispute, he may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. If the non-moving party, after sufficient opportunity for discovery, is unable to meet his burden of proof, summary judgment is clearly proper. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). At the summary judgment stage, "the evidence should be viewed in the light most favorable to the non-moving party[, and] the facts and any inferences that can be drawn from those facts[] must be viewed in the light most favorable to the non-moving party.'" *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009) (quoting *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005) (citations omitted)); *see also Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003) ("In evaluating the evidence, [the district court] 'draw[s] all reasonable inferences therefrom in a light most favorable to the non-moving party.'") (quoting *PDV Midwest Ref., L.L.C. v. Armada Oil & Gas Co.*, 305 F.3d 498, 505 (6th Cir. 2002)).

Irrelevant or unnecessary factual disputes do not create genuine issues of material fact. *St. Francis Health Care Centre v. Shalala*, 205 F.3d 937, 943 (6th Cir. 2000). A fact is "material" if its resolution affects the outcome of the lawsuit. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d

574, 581 (6th Cir. 2001). "Materiality" is determined by the substantive law claim. *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir. 2000). An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics & Space Admin.*, 14 F.3d 1143, 1148 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 248).

A.

Michigan law recognizes a privilege for communications to police officers about suspected criminal activity, but the nature of the privilege is far from clear. The defendants contend that the privilege is absolute, and there is language in the case law that gives some support to that view. For instance, in *Hall v. Pizza Hut of America, Inc.*, 153 Mich. App. 609, 396 N.W.2d 809 (1986), the court reversed the denial of summary judgment to a restaurant employee who told police that she thought she recognized an individual in the restaurant who had robbed the store on a earlier occasion. The court held that the plaintiff's claims based on those statements could not proceed because "information given to police officers regarding criminal activity is absolutely privileged." *Id.* at 619, 396 N.W.2d at 813. The court cited *Shinglemeyer v. Wright*, 124 Mich. 230, 239-240, 82 N.W. 887, 890 (1900), for that proposition, but that case allowed for the possibility that "malicious" statements may be actionable, suggesting that the privilege is qualified, not absolute. The *Hall* court itself expressed uncertainty on that point, observing that "[e]ven if [the defendant's] statements were not absolutely privileged, a qualified privilege extends to all communication," and then concluding that "at least a qualified privilege protected [the defendant's] statements." *Hall*, 153 Mich. App. at 619, 396 N.W.2d at 813.

In *Smith v. Primco Mgmt. Corp.*, No. 193207, 1997 WL 33344476 (Mich. App. July 15, 1997), the court discussed its previous opinion in *Hall* and concluded that "the Court was not

entirely certain that the privilege was absolute." *Id.* at *3. The *Smith* court concluded "that no more than a qualified privilege attaches to communications made to police officers concerning criminal activity." *Ibid.*

However, a year later, the court of appeals discussed the same cases and concluded that "statements made to the police regarding criminal activity are also entitled to an absolute privilege." *Brooks v. Owosso Public Schools*, Nos. 188556 & 194424, 1998 WL 1991899, at *2 (Mich. App. Mar. 27, 1998). The court ultimately held:

> Because the statements of defendants . . . to [the o]fficer . . . regarding their suspicions that plaintiffs may have been responsible for the vandalism were absolutely privileged, we conclude that plaintiffs are unable to establish an unprivileged communication to a third party, which is an essential element of a defamation claim.

*Ibid.* The *Brooks* court, however, relied entirely on *Shinglemeyer* and *Hall*, neither of which plainly supports an absolute privilege for all statements to police officers relating to criminal activity.

This Court finds it unlikely that, based on the current precedent, the Michigan Supreme Court would find that intentionally false statements to police officers about an individual's involvement in a crime are not actionable. *See Bacon v. Mich. Cent. R. Co.*, 66 Mich. 166, 170, 33 N.W. 181, 183 (1887) (observing that the absolute privilege "rests upon the same necessity that requires the individual to surrender his personal rights, and to suffer loss for the benefit of the common welfare. Happily for the citizen, this class of privilege is restricted to narrow and well-defined limits"). Statements regarding suspected criminal activity made to the police are privileged, but the privilege is a qualified one.

To overcome a qualified privilege, the plaintiffs must come forward with evidence that Drs. Stanley's and Joslin-Page's statements to the police were intentionally false or made with reckless

disregard for the truth. *Hall*, 153 Mich. App. at 620, 396 N.W.2d at 814; *see also Prysak v. R.L. Polk Co.*, 193 Mich. App. 1, 15, 483 N.W.2d 629, 636 (1992) (citing *Smith v. Fergan*, 181 Mich. App. 594, 597, 450 N.W.2d 3, 5 (1989) ("A plaintiff may overcome a qualified privilege only by showing that the statement was uttered with actual malice, i.e., with knowledge of its falsity or reckless disregard of the truth.")).

The only evidence offered by the plaintiffs on the issue of malice is the medical opinion of their expert obstetrician Dr. Jeffery Wener. He asserts that the medical reports provide no evidence that Sanders had given birth to a viable fetus. The plaintiffs also argue that there is no other evidence that supports the claim that Sanders gave birth to a live fetus. They reason that if a jury believes that Sanders's pregnancy was nowhere near viability, they could infer that Stanley's and Joslin-Page's statements were made with malice.

The Court finds that the plaintiffs ask too much of their evidence. The differences in the medical opinions in this case, even as profound as they may be, cannot support the inference that the doctors at Botsford Hospital, when expressing their concern that a live baby may be at risk and need help, made statements to the police with malice. There is no evidence that the doctors' opinions that a viable fetus could have been delivered was intentionally false. Nor is there evidence that they were reckless in their statements. Even Dr. Wener testified that he did not believe there was any improper motive and instead believed the doctors simply made a mistake. Br. in Support of Mot. Summ. J., Ex. C, dep. of Wener, at 74-75. Based on the evidence, no reasonable jury could conclude otherwise.

In addition, Michigan's Child Protection Law mandates that "[a] physician . . . who has reasonable cause to suspect child abuse or neglect shall make immediately . . . an oral report . . . of

the suspected child abuse or neglect to the [Family Independence Agency]." Mich. Comp. Laws § 722.623(1)(a). The law also allows "any person . . . who has reasonable cause to suspect child abuse or neglect [to] report the matter or the [Family Independence Agency] or a law enforcement agency." Mich. Comp. Laws § 722.624. The law includes an immunity provision that states, "[a] person acting in good faith who makes a report, cooperates in an investigation, or assists in any other requirement of this act is immune from civil or criminal liability that might otherwise be incurred by that action. A person making a report or assisting in any other requirement of this act is presumed to have acted in good faith." *Id.* § 722.625; *see also Warner v. Mitts*, 211 Mich. App. 557, 559, 536 N.W.2d 564, 566 (1995).

The statements by defendants Stanley and Joslin-Page to the police expressing concern over the possibility that Sanders gave birth to and perhaps abandoned a viable fetus plainly fall within the ambit of "suspected child neglect." As noted, the immunity provision applies to statements made in good faith. The only evidence the plaintiffs offer to prove bad faith is opinion testimony that the doctors were way off on their estimate of the length of Sanders's pregnancy. But the Michigan courts have held that where a physician files a report that is based on an "allegedly negligent diagnosis," the plaintiff cannot avoid the statute's grant of immunity as a matter of law. *Awkerman by Awkerman v. Tri-Cnty. Orthopedic Group, P.C.*, 143 Mich. App. 722, 726-27, 373 N.W.2d 204, 206 (1985).

The Court concludes, therefore, that the plaintiffs' claims against Drs. Stanley and Joslin-Page that are based on their statements to the police cannot proceed as a matter of law. The Court will dismiss the counts of the amended complaint alleging defamation, intentional infliction of emotional distress, and invasion of privacy against those defendants.

B.

In order to establish a claim of false imprisonment, plaintiff Sanders must prove that the defendants "(1) [committed] an act committed with the intention of confining another, (2) the act directly or indirectly results in such confinement, and (3) the person confined is conscious of his confinement." *Moore v. City of Detroit*, 252 Mich. App. 384, 387, 652 N.W.2d 688 (2002) (quoting *Adams v. Nat'l Bank of Detroit*, 444 Mich. 329, 341, 508 N.W.2d 464 (1993)). Sanders acknowledges that she cannot maintain a false imprisonment action for her hospital confinement between July 1 and 4 because she was unconscious during that period. However, she maintains that the act of keeping her in the hospital under a pseudonym and preventing her friends from visiting her from July 4 until her discharge on July 8 amounted to false imprisonment.

Perhaps it did, but the plaintiff has not shown that Drs. Stanley and Joslin-Page played any role in that activity. At most, the plaintiff has shown that these physicians were involved in the decision to keep Sanders for further treatment and monitoring, which was a medical decision that Sanders could have accepted or declined. There is no evidence that Sanders was in any physical condition to leave the hospital before she discharged. The undisputed evidence is that a Botsford Hospital risk management official made the decision to maintain Sanders under a false name. Stanley and Joslin-Page may have been aware of that action, but there is no evidence from which a jury could conclude that they were complicit in it. Both doctors testified that they had no involvement in assigning the plaintiff an alias, and their testimony is unrebutted.

The Court concludes, therefore, that these defendants are entitled to judgment on the false imprisonment count as a matter of law.

III.

The Court concludes that the statements made by defendants Adrienne Stanley and Judith Joslin-Page to the police concerning the plaintiff's pregnancy, likely gestational term, and possibility of birthing a live baby were protected by qualified immunity. The Court finds that the plaintiffs have not come forward with evidence from which a jury could infer that those statements were made with malice. The Court also finds that the plaintiff has not offered evidence establishing the elements of false imprisonment against these defendants.

Accordingly, it is **ORDERED** that the motion for summary judgment by defendants Adrienne Stanley and Judith Joslin-Page [dkt. #49] is **GRANTED**.

It is further **ORDERED** that the amended complaint against defendants Adrienne Stanley and Judith Joslin-Page, only, is **DISMISSED WITH PREJUDICE.**

s/David M. Lawson  
DAVID M. LAWSON  
United States District Judge

Dated: May 13, 2011

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on May 13, 2011.

s/Deborah R. Tofil  
DEBORAH R. TOFIL